UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH ISLAND INSTITUTE and CENTER FOR BIOLOGICAL DIVERSITY,<br><br>              Plaintiffs,<br><br>      v.<br><br>DEAN GOULD, in his official capacity as Forest Supervisor for the Sierra National Forest, and UNITED STATES FOREST SERVICE, an agency of the Department of Agriculture,<br><br>              Defendants. | No. 1:14-cv-01140-KJM-SKO<br><br>ORDER |

    This matter is before the court on the motion by Earth Island Institute ("EII") and Center for Biological Diversity ("CBD") (collectively "plaintiffs") for a preliminary injunction. (ECF No. 20.)  Dean Gould ("Gould") and the United States Forest Service ("Forest Service") (collectively "defendants") as well as intervenor-defendant Sierra Forest Products ("intervenor") oppose the motion.  (ECF Nos. 68 & 66.)  The court held a hearing on the matter on August 15, 2014, at which Rachel Fazio appeared for plaintiffs; Marissa Piropato appeared for defendants;

/////

1

and Julie Weis (pro hac vice) appeared for intervenor.[1]  As explained below, the court confirms its DENIAL of plaintiffs' motion.

I.     BACKGROUND

The claims in this case arise out of defendants' alleged violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370h, and the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687.  (First Am. Compl. ("Compl.") ¶ 4, ECF No. 45.)  In alleging various violations, plaintiffs seek a permanent injunction against the Aspen Recovery and Reforestation Project ("Aspen Project").  (*Id.* ¶ 2.)  EII is a nonprofit membership organization with its mission "to develop and support projects that counteract threats to the biological and cultural diversity that sustains the environment."  (*Id.* ¶ 7.)  CBD is also a nonprofit membership organization with a mission "to protect and restore habitat and populations of imperiled species, including from the impacts of logging and climate change."  (*Id.* ¶ 9.)  Defendant Gould is the Forest Supervisor of the Sierra National Forest ("Forest") and is sued in his official capacity.  (*Id.* ¶ 14.)  Defendant Forest Service is an agency of the United States Department of Agriculture.  (*Id.* ¶ 15.)  Finally, intervenor is a privately-owned mill operator that was officially awarded the logging contract in this matter by the Forest Service.  (*See* ECF No. 55 at 1–3.)

In July 2013, the Aspen fire burned about 22,350 acres of the Forest.  (*Id.* ¶ 25.)  The fire had a mosaic effect, with approximately 80 percent comprising low and moderate-intensity fire effects.  (*Id.*)  Out of 22,350, 9,371 acres were burned at high to moderate severity.  (AR[2] 34.)  After the fire burned out, the Forest Service designed a post-fire timber harvesting project, the Aspen Project.  In November 2013, the Forest issued a notice, inviting public comments on the Aspen Project.  (AR 1580, 1582, 1613.)  The project involves the logging of 1,835 or 20 percent of the 9,371 acres where the fire was of moderate to high-intensity.  (AR 41.)  The logging could extend onto additional acres as drought persists.  (*Id.*)  The 1,835-acre area, plaintiffs represent, provides important habitat for the California Spotted Owl, the Pacific Fisher,

---

[1] Ritu Ahuja also was present at counsel table for defendants, but is not admitted to practice before this district and did not argue.
[2] AR refers to the Aspen Administrative Record DVD lodged with the court.

2

and the Black-backed Woodpecker.  (*See generally* Compl.)  More specifically, plaintiffs allege the Aspen Project "would eliminate about 38% of the estimated Black-backed Woodpecker pairs . . . , and would remove about 41% of the suitable . . . habitat" (*id.* ¶ 33); that the logging "near or adjacent to territory cores" will likely reduce the occupancy of the California Spotted Owl (*id.* ¶¶ 48–49); and that the logging of the areas burned at moderate to high-intensity will reduce the Pacific Fisher's habitat (*id.* ¶¶ 63–65).

In June 2014, the Forest Service released its final Environmental Assessment ("EA") of the Aspen Project for public comment.  (AR 25.)  The Forest Service identified several purposes of the Aspen Project, including, but not limited to, providing for safety (*id.* 36); recovering the economic value of the burned trees (*id.* 36–37); minimizing large-scale fires (*id.* 37–38); providing habitat by snag retention (*id.* 38–39); reestablishing forested conditions (*id.* 39–40); and eradicating weeds (*id.* 40–41).  In addition, the Chief of the Forest Service approved an Emergency Situation Determination ("ESD") on the Aspen Project, reasoning "[i]mmediate implementation is necessary to remove roadside and campground hazard trees and restore the burned area by better assuring that a loss of commodity value does not jeopardize the ability to fulfill critical restoration and resource protection objectives."  (AR 31093–31095.)  Subsequently, after considering the final EA, defendant Gould issued a Decision Notice and Finding of No Significant Impact ("FONSI"), concluding that no Environment Impact Statement ("EIS") was necessary because the actions to be taken under the Aspen Project would not "have a significant effect on the quality of the human environment considering the context and intensity of impacts . . . ."  (*Id.* at 14–15.)

In July 2014, plaintiffs filed a complaint for declaratory and injunctive relief (ECF No. 1) and shortly thereafter moved for a preliminary injunction.  (ECF No. 20.)  Because the Aspen Project was scheduled to commence on August 1, 2014, plaintiffs sought a temporary restraining order ("TRO") to preserve the status quo pending the preliminary injunction hearing.  (ECF No. 47.)  At the hearing on the TRO, the parties reached a stipulation, which was

/////

/////

subsequently modified.  (ECF No. 61.)  The parties agreed to the following while plaintiffs' preliminary injunction motion was pending:

1. Harvest of plantation units 324, 325, 237, 30, 23, 244, 15, and 255 in their entirety;

2. Harvest of the plantation portions only of units 327 and 53;

3. Roadside hazard tree removal along Maintenance Level 3, 4 and 5 roads within the Project area;

4. Roadside hazard tree removal along Maintenance Level 2 roads where associated with the above-referenced operations; and

5. Hazard tree removal within campgrounds in the Project area.

(ECF No. 62.)

Subsequently, the parties agreed to the following additional interim activities:

1. The removal of log deck(s) and/or individual logs from trees that were cut in Unit 331 on August 1, 2014;

2. The removal of the approximately 50,000 board feet of timber which was cut in Unit 204 on August 1, 2014, but was not removed;

3. The logging and removal of trees in plantations (areas of trees relatively uniform in size and generally less than 18 inches in diameter, and typically occurring in pockets 1-2 acres in size) located at various points in the western quarter of Unit 204 within approximately 150 meters of road 7S304; and

4. The logging and removal of hazard trees marked as of August 6, 2014 along maintenance level 2 road 7S304 (heading east on 7S304 away from West Kaiser campground) in the western quarter of Unit 204, ending where 7S304 splits and becomes 7S302B and 7S302C.

(ECF No. 71.)

At hearing on the preliminary injunction, while plaintiffs suggested further stipulations might be possible, defendants took the position that efforts to reach a negotiated resolution had been exhausted.

II.     STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right[,]" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted

unless the movant, *by a clear showing*, carries the burden of persuasion[,]" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)). In determining whether to issue a preliminary injunction, federal courts must consider whether the moving party "[1] is likely to succeed on the merits, . . . [2] is likely to suffer irreparable harm in the absence of preliminary relief, . . . [3] the balance of equities tips in [the movant's] favor, and . . . [4] an injunction is in the public interest." *Id.* at 20.

The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test." *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). That formulation is referred to as the "serious questions" or the "sliding scale" approach: "'serious questions' going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test," *id.* at 1132). "In other words, 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Under the "serious questions" approach to a preliminary injunction, "[t]he elements of the preliminary injunction test must be balanced, so that a stronger showing of one element may offset a weaker showing of another."[3] *Lopez*, 680 F.3d at 1072.

Moreover, in each case and irrespective of the approach to a preliminary injunction, a court must balance the competing alleged harms while considering the effects on the parties of the granting or withholding of the injunctive relief. *Winter*, 555 U.S. at 24. In exercising that discretion, a court must also consider the public consequences of the extraordinary remedy. *Id.* The balance of harms analysis applies when a case, as here, involves environmental

---

[3] To the extent there is a conflict between the "serious questions" approach and the *Winter* approach, *see Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1141 (C.D. Cal. 2012) (declining to apply the standard set forth in *Cottrell* in light of the Ninth Circuit's decision in *Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)), this court notes that plaintiffs have not satisfied their burden of seeking a preliminary injunction under either standard.

5

injury.  *The Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008).  As the Supreme Court noted toward the beginning of the modern environmental movement, in an observation that still has force,

> [o]ur society and its governmental instrumentalities, having been less than alert to the needs of our environment for generations, have now taken protective steps.  These developments, however praiseworthy, should not lead courts to exercise equitable powers loosely or casually whenever a claim of 'environmental damage' is asserted. . . . The decisional process for judges is one of balancing and it is often a most difficult task.

*Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 409 U.S. 1207, 1217–18 (1972).

III.   DISCUSSION

A likelihood of success on the merits or "serious questions" going to the merits may be sufficient to warrant issuance of preliminary injunction where the balance of hardships tips in the movant's favor, in the latter instance sharply, and the movant satisfies the other elements.  *Alliance for the Wild Rockies*, 632 F.3d at 1131, 1135.  However, here, because plaintiffs have not shown either that the balance of equities tips in their favor, sharply or not, or that an injunction is in the public interest, the court need not reach the other two elements.  *Coltharp v. Herrera*, 13-56589, 2014 WL 3720302, at *2 (9th Cir. July 29, 2014) (unpublished; addressing both approaches to a preliminary injunction); *see also DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776–77 (9th Cir. 2011) (because the plaintiff did not meet the likelihood of success on the merits factor, the court did not need to consider the other three elements).

          A.  Balance of Hardships

Plaintiffs argue that once logging begins, they will suffer a "definite irreparable harm" in the form of lost "rare and biodiverse complex early seral forest [("CESF")]," whereas, there will be no irreparable harm to the Forest Service from the issuance of an injunctive relief.  (ECF 20 at 22–23.)  Plaintiffs argue the only harm defendants will suffer, the loss of revenue, is outweighed by the harm to the environment that will result with full deployment of the Aspen Project.  (*Id.* at 24.)

/////

6

Defendants counter that

> if the project does not go forward: (1) a real safety risk exists to the public and public servants as a result of hazardous trees or fallen trees that can hinder wildfire suppression efforts; (2) the public will lose the benefit of a boost to the local economy as a result of the creation of jobs by the project; (3) the public will lose the benefits of the reforestation efforts, which will expedite forest regeneration, recover forested conditions, prevent domination of shrub species, and repair habitat structure for wildlife; and (4) the government will lose the opportunity to receive the prime economic value of the timber and could lose the ability to do the project at all if it is delayed, causing the economic value of the timber to decline.

(ECF No. 53 at 19–20.)  Assuming without deciding that plaintiffs' reply declaration accurately reports that the bulk of hazard tree removal has been completed, the court considers only defendants' last three arguments.  (*See* ECF No. 74 at 2–3.)

Intervenor responds that more than mere revenue loss is at stake.  (ECF No. 29 at 11–13.)  Specifically, intervenor says the Aspen Project "will provide direct benefits to . . . numerous small businesses" and "will promote an economic base for jobs, sustaining local rural communities in the future."  (*Id.* at 1.)  In addition, [t]he Forest Service understands the need to support companies like Sierra Forest Products . . . ."  (*Id.*)  Moreover, intervenor avers that with each passing day, timber subject to harvest is being lost to insect damage, fungal staining and drought-related deterioration.  (*See* ECF No. 67 ¶ 5; ECF No. 52 ¶ 3.)

In balancing the equities in this case, the court compares the harms invoked by plaintiffs against the harms invoked by defendants and intervenor.  *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014).  In that inquiry, "[b]oth the economic and environmental interests are relevant factors, and both carry weight in this analysis."  *Id.*

In the present case, in balancing the environmental injuries identified by plaintiffs against the injuries identified by defendants and intervenor, plaintiffs have not met their burden of demonstrating that the balance of hardships weighs in favor of granting a preliminary injunction. *See McNair*, 537 F.3d at 1005 ("Our law does not . . . allow us to abandon a balance of harms analysis just because a potential environmental injury is at issue.").

7

To demonstrate harm, plaintiffs rely on the declaration of Chad Hanson, Ph.D., a founding member of the John Muir Project ("JMP"), a project of EII. (ECF No. 20-2 ¶ 2.) Dr. Hanson declares that his research and recreational interests will be harmed if the Aspen Project proceeds:

> . . . I will no longer be able to pursue my research or recreational interests on the acres where logging, native shrub eradication/reduction, and artificial conifer plantation establishment are planned, because the species that I study strongly tend to avoid areas subjected to post-fire logging, the shrub-nesting species that I study and observe strongly tend to avoid areas where shrubs have been removed, and because much if not most of the natural conifer regeneration will be killed by ground-based tractor logging.

(*Id.* ¶ 8; ECF No. 48 ¶ 8.) It is clear from the record as a whole that the species to which Hanson refers are the Black-backed Woodpecker, California Spotted Owl, and Pacific Fisher. In his declaration, Hanson does not say that he is unable to conduct his research in other areas, either within the Aspen Project where timber salvage is not planned, or in other locations outside the Aspen Project area. (*See, e.g.*, ECF No. 20-2 ¶ 10; ECF No. 48 ¶ 10); *see also McNair*, 537 F.3d at 1005 (declining "to adopt a rule that *any* potential environmental injury *automatically* merits an injunction" (emphasis in original)).

Hanson also avers that his aesthetic interests and the interests of other JMP and CBD members will be harmed in that he finds "areas subjected to post-fire logging and montane chaparral eradication to be ugly—a sight of devastation that could not be more opposite to natural, unmanaged complex early seral forest [CESF], in my view." (*Id.* ¶ 8.) He does not say, however, that the Aspen Project area is the primary area he relies on, or the only area remaining, for satisfaction of his aesthetic interests.

Hanson concludes that

> [u]nless the Forest Service is ordered to abide by environmental safeguards and legal requirements for the . . . Aspen projects, science will not inform management and rare species associated with [CESF] will have even fewer places to live, and I will have even fewer complex early seral forest areas to study and enjoy for their recreational and scenic values. I, as well as other JMP members and the general public, will suffer substantive harm.

(*Id.* ¶ 10.) While his reference to "even fewer" forest areas essentially concedes that others

8

remain, he does not provide a quantitative estimate of what impact, proportionately, the Aspen Project salvage operations will have on the total CESF areas available for study, recreational and aesthetic enjoyment.

Ultimately, plaintiffs argue that if the Aspen Project is allowed to proceed as currently authorized, it could result in the loss of important habitat: an unspecified number of acres of habitat for the Spotted Owl in the moderate and high-intensity fire areas (ECF No. 20 at 4–6); "approximately 2,000 acres" of foraging habitat for the Pacific Fisher (*id.* at 13–14); and 1,464 of 3,438 acres of habitat for the Black-backed Woodpecker, (ECF No. 20 at 7–9). Following the hearing, plaintiffs provided a map, without an explanatory declaration, suggesting that four single Spotted Owls, two pairs, and one nesting pair are located in affected areas. (*See* ECF No. 78.) When pressed at hearing, they suggested that of the 250 remaining Pacific Fishers, two might be negatively affected by the Project. While plaintiffs conceded that the nesting season has just ended for the woodpecker, they expressed concern that the Project activities could still negatively affect fledglings.

Defendant Gould, on the other hand, declares the Aspen Project "was designed to avoid significant adverse impacts and to leave substantial portions of the Aspen Fire area untouched." (ECF No. 68-1 ¶ 8.) Gould avers:

> Several of the Project objectives, such as restoring forested conditions, providing wildlife habitat through retention of snags and large woody debris, eradication of noxious weeds and reducing the risk of high-intensity wildfires, are directed at improving ecological conditions in the Aspen Fire area. Those objectives would be frustrated if the Project were significantly delayed by a court injunction. The combination of environmentally-protective design features and ecological objectives will ensure that the Aspen Project will not only avoid significant environmental harm, but will also contribute to environmental restoration and recovery.

(*Id.*)

Specifically, defendants argue that of the total area comprising CESF (9,371 acres of 22,350) (AR 34), the Project involves the logging of 1,835 acres, with a possibility of logging extending onto an additional 3,239 acres (AR 41). Moreover, defendants reason that if the Project proceeds as authorized, the impact on the relevant species will be minimal: the Project

will retain 10,029 of 13,456 acres of former habitat for the Spotted Owl (ECF No. 53 at 3); no habitat for the Pacific Fisher will be removed (*id.* at 4); and the Project will retain 1,974 of the 3,439 acres of habitat for the Black-backed Woodpecker (*id.* at 3). Plaintiffs say defendants' determination, that the Aspen Project would not remove any habitat for the Pacific Fisher, is incorrect because defendants do not acknowledge that the Pacific Fisher uses "mature and old forest . . . burned at moderate to high severity" for foraging. (ECF No. 20 at 13–14.) At the hearing, consistent with the record, defendants clarified they did consider plaintiff's theory and found it unpersuasive. (*See, e.g.,* ECF No. 68 at 5–11.) *See also Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (noting that courts should be at their most deferential "when reviewing scientific judgments and technical analyses within [an] agency's expertise. . . . And [w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive" (alteration in original, internal citations and quotation marks omitted)).

Moreover, Gould says that if the Aspen Project is delayed "to the point that insufficient commercial value exists in the trees to support a timber sale," the Forest will not "have adequate appropriate funding to complete the necessary work." (ECF No. 68-1 ¶ 19.) Gould also provides examples of three fires that began toward the end of July 2014, and which he attributes partly to the fuel loadings in the Aspen Fire area; "prompt treatment to reduce high fuel loadings [in that area]" is crucial. (*Id.* ¶ 24.) Plaintiffs, on the other hand, dispute that post-fire logging reduces future fire intensity level, arguing that the studies cited in the final EA do not support defendants' position on fuel loadings and citing to other studies that are contrary to the determinations made in the final EA. (ECF No. 73 at 12–13.) As noted above, however, an agency has discretion to choose among scientific studies, "even if . . . a court might find contrary views more persuasive." *Lands Council*, 629 F.3d at 1074.

In describing the possible effects of the Aspen Project's delay, Gould states that "time is of the essence." (*Id.* ¶ 37.)

> [W]ith every passing day, the trees that burned in the Aspen Fire deteriorate, causing both a loss in timber volume and timber value. As timber volume and value decline, the harvest of such trees becomes less likely. And, the fewer trees that are removed, the less likely it is that the . . . ecological, and socio-economic objectives will be met.
>
> . . . .
>
> [I]f the delay continues to the point that implementation cannot occur during the 2014 operating season[,] . . . the majority of the project goals will be frustrated.

(*Id.* ¶¶ 37–38.)

> As to the permanency of the harms, Gould declares:
>
> The combination of insects, fungi, and weather reduce both the volume and value of fire-killed timber over time, to the point that a tree killed by fire ultimately loses all commercial value. This loss in value is permanent, since wood does not recover value after insects, fungi, and weather have damaged it. Therefore, any Project objectives that depend on the commercial harvest of the fire-killed timber will be permanently lost if the deterioration process renders some or all of the Aspen Project timber commercially worthless.

(*Id.* ¶ 41.) Gould states that "[w]hile it is impossible to predict the last day of this year's operating season with certainty, I expect operations will not be possible as of mid-November. . . . It is essential to harvest as much merchantable timber before the end of the 2014 operating season, since the decay processes that adversely affect timber value and volume will continue throughout the 6-month wet-season, when operations are not allowed." (*Id.* ¶ 42.) Gould opines that if the timber becomes valueless, the timber purchaser will likely abandon the project. (*Id.* ¶ 76.)

Intervenor's declarations, of its logging manager and president, are consistent with Gould's declaration, stating that time is of the essence given the daily deterioration of timber, the limited period of time left in which to conduct timber operations, as well as the August 16 opening of hunting season, which will slow operations to ensure no risk to hunters from the salvage operations. (*See* ECF No. 23 ¶¶ 11–14, 17; ECF No. 52 ¶¶ 3, 13; ECF No. 67 ¶¶ 5, 7, 19.) Intervenor notes that even with the parties' stipulation, it was not able to keep all work crews occupied fully until the preliminary injunction hearing date. (ECF No. 67 ¶¶ 7, 9, 19.) Ultimately, both defendants and intervenor argue that if the Project does not proceed through the

2014 operating period, up to mid-November, it will become inefficient to complete the Project. (ECF No. 68-1 ¶¶ 38, 41, 42, 44–48; ECF No. 67 ¶¶ 13, 19.)

Balancing the hardships, the court finds, weighs against granting a preliminary injunction. Plaintiffs have not met their burden in demonstrating that the potential harm to the habitat for the Black-backed Woodpecker, California Spotted Owl, and Pacific Fisher is so significant as to outweigh the harms invoked by defendants. Moreover, as discussed above, Hanson does not say that he will be unable to conduct research or pursue recreational interests on the remaining acres of CESF. Nor does Hanson say that the areas to be logged are the primary areas he relies on for research and aesthetic interests. Additionally, because of the high-speed of timber deterioration and the approaching deadline for the harvesting season in 2014, a delay of the Aspen Project will significantly affect its viability. The potential economic losses include the potential loss of jobs in the locality. Furthermore, as supported by Gould's declaration, without sufficient profit realized from the Aspen Project, the Forest Service will in effect be precluded from reforestation of the burned areas. While plaintiffs argue that reforestation interferes with species' use of certain CESF areas, and Hanson's ability to further research such use, they have not demonstrated that the hardships to them overcome those articulated by defendants. *See Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010) (affirming the district court's denial of the preliminary injunction motion under similar circumstances).

B.  <u>Public Interest</u>

Plaintiffs argue [w]holesale removal of a large proportion of this rare habitat type in the . . . [Forest] is not in the public interest because we now know how ecologically-important this post-fire habitat is . . . ." (ECF No. 20 at 24.)

Defendants do not dispute "there is a public interest in protecting nature." (ECF No. 53 at 19.) However, "[t]he [Forest] Service must manage the forest with a broader array of management goals in mind, including expediting forest regeneration, reducing road hazards, decreasing wildfire dangers and preventing the loss of timber value." (*Id.*)

Intervenor argues that plaintiffs' characterization of the Aspen Project as "wholesale removal" of "rare" habitat is an exaggeration. (ECF No. 29 at 13–14.) Rather, the

reforestation planned by the Aspen Project "would accelerate the re-establishment of suitable nesting habitat for species like the California [S]potted [O]wl . . . ." (*Id.* at 15.) Intervenor also argues the Aspen Project will significantly benefit the local economy. (*Id.* at 16.)

Where, as here, "an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction." *Id.* Indeed, in determining whether an injunctive relief is warranted, district courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

While "preserving environmental resources is certainly in the public's interest," *McNair*, 537 F.3d at 1005, in light of the discussion above, the court concludes that the Aspen Project's design provides for the preservation of significant resources. While it does not preserve untouched all of the CESF areas plaintiffs identify as important, the Project incorporates detailed mitigation measures to minimize impact on the three species on which plaintiffs focus. (*See* AR 67–68, 72, 76, 191–195, 198–200, 204–207, 209–210, 213–214, 215–221, 222–231.)

Additionally, the Aspen Project would benefit "the public's interest in a variety of other ways." *McNair*, 537 F.3d at 1005. Gould observes that to log the hazard trees, the Forest relies on commercial mills, which in turn will remove the trees only if the trees have commercial value. (ECF No. 68-1 ¶¶ 18–19.) If the Aspen Project is delayed, any commercial value is likely to be lost with no commercial mill willing to complete the project. The Forest has no funds to complete the project on its own. (*Id.*) Gould also declares that "if the dead trees in the Aspen Fire are not removed, they will fall to the forest floor, creating a new source of fuels for a potentially severe wildlife. Such a fire poses a risk to firefighters, local residents, recreationalists visiting the area, wildlife habitat and watershed features." (*Id.* ¶¶ 21, 23–24.) In addition, in terms of socio-economic benefits, if the project proceeds this year, it will support "440 forest-sector jobs." (*Id.* ¶ 32.) "Finally, implementing the Aspen Project provides the public with timber, . . . which is at the core of the Forest Service's mission." (*Id.* ¶ 36 (citing 16 U.S.C. § 475 ("No national forest shall be established, except . . . to furnish a continuous supply of timber for the use and necessities of citizens . . . .") & 16 U.S.C. § 472a (noting "the Secretary of

1    Agriculture, under such rules and regulations as he may prescribe, may sell, at not less than

2    appraised value, trees, portions of trees, or forest products located on National Forest System

3    lands"))).

4         Intervenor confirms defendants' argument that if the Aspen Project is delayed, the

5    trees will lose their commercial value and if the trees lose their commercial value, intervenor will

6    not go forward with the project because it will not be profitable.  In turn, jobs will be lost in

7    intervenor's "rural sawmill."  (ECF No. 52 ¶ 13; *see also* ECF Nos. 23, 67.)

8         While the court recognizes the public's interest in "preserving environmental

9    resources," in the present case, "the public's interest in a variety of other ways" favors denial of

10   the preliminary injunction.  *See McNair*, 537 F.3d at 1005 (district court did not abuse its

11   discretion in denying plaintiff's request for preliminary injunction under similar circumstances);

12   *see also Earth Island Inst. v. Carlton*, CIV. S-09-2020 FCD, 2009 WL 9084754, at *28 (E.D. Cal.

13   Aug. 20, 2009), *aff'd*, 626 F.3d 462 (9th Cir. 2010) (issuance of injunction would not be in

14   public's interest because defendants offered evidence that if the project did not proceed, in

15   addition to a hazardous tree risk remaining, "[] the public w[ould] lose the benefit of a boost to

16   the local economy as a result of the creation of jobs by the Project; [] the public w[ould] lose the

17   benefits of the reforestation efforts, which w[ould] expedite forest regeneration, recover forested

18   conditions, prevent domination of shrub species, and repair habitat structure for wildlife; and []

19   the government w[ould] lose the opportunity to receive the prime economic value of the timber

20   and could lose the ability to do the Project at all if it is delayed, causing the economic value of the

21   timber to decline").

22   IV.    CONCLUSION

23        For the foregoing reasons, plaintiffs' motion for a preliminary injunction is DENIED.

24        IT IS SO ORDERED

25   DATED: August 19, 2014.

27                                                    UNITED STATES DISTRICT JUDGE

14